UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM JONES,

        Plaintiff,

        v.                                    Case No. 18-C-1866

JAY VAN LANEN, et al.,

        Defendants.

## DECISION AND ORDER

*Pro se* plaintiff William Jones filed a lawsuit in the Western District of Wisconsin alleging that Defendants Jay Van Lanen and Andrew Wickman violated his civil rights at the Green Bay Correctional Institution (GBCI). Dkt. No. 1. District Judge Barbara Crabb screened the complaint and allowed Jones to proceed with claims that "Captain Jay Van Lanen and Lieutenant Wickman retaliated against [Jones] and violated his rights to access the courts in violation of the First Amendment by destroying legal documents and evidence." Dkt No. 6 at 5–6. The case was subsequently transferred to this district and assigned to this court. The parties filed cross-motions for summary judgment. Dkt. Nos. 42 and 49. For the reasons discussed below, Jones' motion for summary judgment will be denied, Defendants' motion for summary judgment will be granted, and the case will be dismissed.

## BACKGROUND

Jones is an inmate at GBCI. Defs.' Proposed Findings of Fact (DPFOF), Dkt. No. 51, ¶ 1. Jay Van Lanen and Andrew Wickman are Captains at GBCI. *Id.*, ¶¶ 2–3.

Over the course of two years, Jones mailed his "legal materials" to jailhouse lawyer Raynard Jackson for the purpose of filing three different civil rights lawsuits. Pl.'s Proposed Findings of Fact (PPFOF), Dkt. No. 45, ¶¶ 3, 18, 33. The legal materials consisted of "exhibits, declarations, memorandums, inmate complaints, Health Services Unit (HSU) request forms, Psychological Services Unit (PSU) request forms, etc." *Id*., ¶¶ 3, 18. Jones never actually filed any of the lawsuits, although he asserts he intended to do so. Jones Depo., Dkt. No. 48 at 4, 15:19–16:7; 25:20–26:10; 36:17–37:2.

On April 4, 2018, Van Lanen worked "first shift" in the Restrictive Housing Unit at GBCI.[1] DPFOF, ¶ 7. At some point that morning, Van Lanen went to Jackson's cell to take him to his High School Equivalency Diploma (HSED) testing. *Id*., ¶ 11. Jackson was on administrative confinement at that time; therefore, a strip-search was required prior to leaving the unit. *Id*., ¶ 12. Jackson refused the strip-search. *Id*.

Van Lanen thought that it was odd Jackson refused the standard strip-search required to leave the unit. *Id*., ¶ 13. Van Lanen noted that Jackson had previously expressed interest in completing his HSED and had asked Van Lanen for help in scheduling the testing. *Id*. As Van Lanen talked with Jackson about the issue, he noticed "six or more" boxes of graham crackers and empty canteen wrappers in Jackson's cell. *Id*., ¶ 14. Van Lanen noted that the graham cracker boxes were beyond the unit property limit for Jackson's confinement status so he suspected that

---

[1] The Restrictive Housing Unit houses inmates who are on administrative confinement or disciplinary separation. DPFOF, ¶ 8. Administrative Confinement is a non-punitive segregated status where inmates can be placed if their presence in general population poses a risk to themselves, other inmates, staff, or the institution generally. *Id*., ¶ 9. Disciplinary Separation is a punitive status that inmates may be placed on if they have been found guilty of a major offense. *Id*., ¶ 10.

Jackson may have been hesitant to leave his cell that day because he was hiding something in his cell. *Id.*, ¶ 16.

Jackson eventually left his cell to take his HSED test. *Id.* While Jackson was gone, Van Lanen ordered Correctional Officer Gomm to search the cell for contraband. *Id.*, ¶ 17. Van Lanen and Wickman neither were present for nor conducted the cell search. *Id.*, ¶¶ 18, 32. Gomm found several items in Jackson's cell that he thought were contraband: a stack of documents in excess of unit property limits, a pen insert, a plastic spoon, bottles with unknown liquids, and a damaged hair pick. *Id.*, ¶¶ 19–20. Gomm confiscated the items and took the stack of documents to Van Lanen to review. *Id.*, ¶ 21.

According to Van Lanen, he "briefly reviewed" the stack of documents, which he found were mostly HSU and PSU request forms from other inmates. *Id.* Inmates cannot have documents containing another inmates' personal medical information because it poses a security risk to the institution. *Id.*, ¶¶ 25–26. In particular, personal medical information can be used to manipulate or blackmail other inmates and to make phone calls or request money disbursements under another inmate's name. *Id.* Van Lanen directed Gomm to write Jackson a conduct report for possession of contraband and to include the stack of documents as evidence for Jackson's disciplinary hearing regarding the conduct report. *Id.*, ¶ 25. This was the only time Van Lanen reviewed the documents found in Jackson's cell. *Id.*, ¶ 24.

According to Jackson, Van Lanen reviewed the documents from his cell for "well over an hour." Jackson Depo., Dkt. No. 91-1 at 4, 82:20–21. Jackson states that, at the top of each document in his cell, he made sure he "put Exhibit in the corner, and the number of the exhibit, and [] put Jones versus Van Lanen, *et al*." *Id.* at 2, 70:22–25. The stack of documents in Jackson's cell was "at least like four and a half to like five inches [thick]." *Id.* at 7, 90:17–21. Jackson

3

states, "[i]t was a significant amount of documents in regards to Mr. Jones," as well as documents from other inmates. *Id*.

According to Jones, the HSU and PSU request forms that were in Jackson's cell were only a portion of the "legal materials" he had sent to Jackson over the course of two years. Pl.'s Supplemental Proposed Findings of Fact (PSPFOF), Dkt. No. 65, ¶ 89. Jones maintains that the "legal materials" he sent to Jackson were "clearly marked as legal documents." *Id.*, ¶ 84.

About a week after the cell search, on April 9, 2018, Jones filed an inmate complaint alleging that his "legal materials" were confiscated from Jackson's cell. DPFOF, ¶ 45. Inmate Complaint Examiner (ICE) Jodene Perttu recommended dismissing the inmate complaint because it related to a pending conduct report against Jackson. *Id*., ¶¶ 4, 46. On April 16, 2018, Jones filed another inmate complaint about the same issue. *Id*., ¶ 47. Perttu rejected that inmate complaint because Jackson's conduct report process was still pending. *Id*. Perttu did not contact Van Lanen about either inmate complaint. *Id*., ¶¶ 46, 48.

At some point after Jackson's cell search but before Jackson's conduct report hearing, Van Lanen vaguely remembers Jones attempting to talk to him about the documents confiscated from Jackson's cell. *Id*., ¶ 29. Van Lanen did not take any further action regarding the documents because a hearing officer would review the documents more carefully during Jackson's disciplinary proceeding and would determine what to do with them. *Id*., ¶¶ 30–31. According to Jones, Van Lanen allegedly said, "It's contraband now and I look [sic] through it and you won't use it to sue me . . . . I'll be speaking to Lt. Wickman making sure he knows that it's contraband and not to return it." PSPFOF, ¶ 90.

On April 30, 2018, Wickman served as the hearing officer for Jackson's conduct report hearing. DPFOF, ¶ 33. At the hearing, Wickman listened to testimony from Jackson, Jones, and

4

Van Lanen. *Id*., ¶ 37. Jackson testified that the documents were "legal work" and were not contraband. *Id*., ¶ 39. Jones testified that he had mailed Jackson his "legal materials" so that Jackson could provide him with legal assistance. PPFOF, ¶ 29. Van Lanen testified that Jackson was not allowed to have the documents in his cell because they contained other inmates' private medical information. DPFOF, ¶ 35.

After the hearing, Wickman reviewed the stack of documents confiscated from Jackson's cell. *Id*., ¶ 37. He noted that the documents were not marked as "legal" materials and did not contain a case name, case number, case caption, or court stamp. *Id*., ¶ 39. He also observed that the documents were mostly HSU and PSU request slips from other inmates and a few inmate complaints. *Id*. Wickman concluded that Jackson was not authorized to have documents containing other inmates' personal medical information and found Jackson guilty of possession of contraband. *Id*., ¶¶ 42–43. He ordered disposal of the documents and had no further involvement with this case. *Id*., ¶ 44.

On May 6, 2018, Jones filed another inmate complaint alleging that his "legal materials" were confiscated from Jackson's cell. PPFOF, ¶ 36. Perttu dismissed the complaint, explaining that Jones was responsible for making copies of all "legal materials" he sent to other inmates. Dkt. No. 46-1 at 77. She informed Jones that he could purchase additional copies of his personal medical records from HSU. *Id*. Jones filed another inmate complaint about the same issue on May 15, 2018. PPFOF, ¶ 38. ICE Alan Degroot rejected the complaint, the very next day, because it was previously addressed by Perttu. *Id*., ¶ 39.

At some point after May 16, 2018 but before July 5, 2018, Warden Scott Eckstein became aware that Wickman had ordered destruction of the entire stack of documents from Jackson's cell. On July 5, 2018, Warden Eckstein sent Jones a letter explaining that he had recently reviewed the

stack of documents from Jackson's cell and found there were some HSU and PSU requests and inmate complaints that belonged to him. DPFOF, ¶¶ 49–50. He told Jones that his documents would be returned once staff finished sorting through all the documents. *Id.* Warden Eckstein also advised Jones that there were procedures he had to follow if he wanted to provide copies of his legal materials to another inmate in the future. *Id.*, ¶ 50.

About a week later, on July 13, 2018, Jones filed another inmate complaint alleging that he still had not received his "legal materials" from Jackson's cell. *Id.*, ¶ 51. Perttu responded that staff were still sorting through the confiscated documents and that Jones' documents would be returned once they completed sorting through the materials. *Id.*, ¶¶ 52–53. Three days later, on July 16, 2018, Jones filed another inmate complaint about the same issue. *Id.* Perttu followed up with Warden Eckstein about the status of the document sorting. *Id.*, ¶ 54. Warden Eckstein then authorized Perttu to sort through the documents herself and return any that belonged to Jones as soon as possible. *Id.*, ¶ 55.

Sometime at the end of July or the beginning of August 2018, Perttu completed her review of the confiscated documents. *Id.*, ¶¶ 56–57. Perttu searched for documents that clearly indicated on their face that they belonged to Jones since it would have been a security risk to give Jones documents that were not clearly marked as his in the event those documents belonged to another inmate. *Id.* ¶ 59. The documents Perttu reviewed included HSU requests, PSU requests, and inmate complaints. *Id.*, ¶ 58. Perttu personally delivered Jones' documents to his cell. *Id.*, ¶¶ 56–57. She did not complete a "property receipt" because Jones' property inventory already listed the paperwork as approved property. *Id.*, ¶ 60.

On September 14, 2018, Warden Eckstein reviewed a letter that stated Jones still had not received his "legal materials." *Id.*, ¶ 61. Warden Eckstein contacted Perttu, who told him that

6

she had gone through the documents and personally delivered Jones' documents to his cell. *Id*., ¶ 62. Warden Eckstein relayed the message to Jones and instructed Jones to talk to Jackson about any other documents that he thought were missing. *Id*., ¶ 63. Jones asked Jackson to help him recreate his legal materials, but Jackson refused. Dkt. No. 90, ¶ 3.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### I. First Amendment Retaliation

To prevail on a First Amendment retaliation claim, Jones must provide evidence that would allow a reasonable jury to conclude: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity at least partially motivated the deprivation suffered." *Streckenbach v. Meisner*, 768 F. App'x 565, 569 (7th Cir. 2019) (citing *Walker v. Groot*, 867 F.3d 799, 803 (7th Cir. 2017)).

If Jones establishes these three elements, "the burden then shifts to the defendants to show that they would have taken the action despite the bad motive." *Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013). "A defendant can still prevail . . . if he shows that the offending action would have happened even if there had been no retaliatory motive, i.e. 'the harm would have occurred anyway.'" *Lake v. Flagg*, 319 F.R.D. 252, 256 (S.D. Ill. 2017) (citing *Mays*, 719 at 634–35).

The United States Supreme Court recently explained that "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citations omitted). "[I]t must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*; *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006) (recognizing that, although it "may be dishonorable to act with an unconstitutional motive," an official's "actions colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway"). The Seventh Circuit has further explained that:

> To prove causation on a First Amendment retaliation claim, a plaintiff may rely on both direct and circumstantial evidence. Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption. Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group.

*Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019) (internal quotation marks and citations omitted).

Defendants concede that Jones can produce evidence to establish the first two prongs of his retaliation claim. Dkt. No. 50 at 7. They argue, however, that the claim fails on the third prong because Jones fails to provide evidence from which a reasonable jury could conclude that Defendants intended to retaliate against Jones when they took actions against Jackson. The court agrees.

8

First, no reasonable jury could conclude that Defendants knew Jones was planning to sue them prior to April 2018. Van Lanen and Wickman both provide declarations swearing that they did not know Jones was planning to sue them at the time of Jackson's cell search and subsequent disciplinary proceeding in April 2018. *See* Van Lanen Dec., Dkt. No. 55, ¶ 22; *see* Wickman Dec., Dkt. No. 53, ¶ 14. Jones provides no evidence on *when* he allegedly told Defendants that he planned to sue them or *how* they should have known that he planned to sue them given that he never actually filed any of the lawsuits. Jones implies that it is common knowledge at GBCI that he is litigious so Van Lanen and Wickman should have known he planned to sue them at some point in the future, but speculation alone does not create a genuine issue of material fact. *Streckenbach*, 768 F. App'x at 570 ("[The plaintiff] speculates that [the defendant] must have learned about his lawsuit because the prison is a small place and word gets around, but neither speculation nor suspicious timing—without more—is enough to survive summary judgment.").

Second, even if Defendants did know Jones planned to sue them at some point in the future, Jones has no plausible explanation for why they allegedly decided to search Jackson's cell for his legal materials in April 2018, when he had been sending Jackson his legal materials for over two years. *See Cunningham v. Jenkins*, No. 17-cv-126-RJD, 2020 WL 230601, at *6 (S.D. Ill. Jan. 15, 2020) ("While evidence of retaliatory motive may be shown in some instances by suspicious timing, the record is not clear as to what Plaintiff is alleging is the timing in this instance."). Defendants, on the other hand, both have reasonable explanations for why they did what they did in April 2018. Van Lanen explains that he ordered Gomm to search Jackson's cell on April 4 because he saw property in excess of unit limits. He suspected that Jackson may have been hiding contraband among the excessive property because Jackson refused to leave his cell that day for testing that he had requested. Wickman explains that he deemed the stack of

9

documents "contraband" because Jackson was not allowed to have documents that contained other inmates' private medical information.

Jones disputes all of this and speculates that Van Lanen "ordered" Gomm to specifically seek out his "legal materials" from Jackson's cell. Jones, however, has no credible evidence to prove that this conversation ever happened. The undisputed facts show that Van Lanen was not present during the cell search and did not supervise the cell search. Gomm independently searched the cell and confiscated a number of items that he thought were contraband. One of those items was a stack of documents four to five inches thick. Both parties agree that Jones' documents were comingled with other inmates' documents in that stack. Gomm confiscated the entire stack of documents, not just the documents related to Jones, and he attached all of the documents as evidence for the disciplinary hearing. Based on these facts, no reasonable jury could conclude that Van Lanen ordered Gomm to specifically seek out Jones' "legal materials" for the purpose of retaliation.

Jones states that he heard Van Lanen say "It's contraband now and I look [sic] through it and you won't use it to sue me . . . . I'll be speaking to Lt. Wickman making sure he knows that it's contraband and not to return it." Even if this is true, Jones concedes that the stack of documents from Jackson's cell contained other inmates' private medical information. Thus, even if Van Lanen had a retaliatory motive, Gomm still would have had to confiscate the entire stack of documents because Jackson's possession of the documents posed a security risk to the institution. Similarly, Wickman still would have concluded that the documents were "contraband" because Jackson was not allowed to have documents containing other inmates' private medical information. Accordingly, Jones cannot proceed past summary judgement with his First Amendment retaliation claims. *See Harris v. Walls*, 604 F. App'x 518, 521 (7th Cir. 2015)

("A prisoner who has evidence that officials were motivated to discipline the prisoner because of protected speech cannot prevail if the officials show, without contradiction, that they would have disciplined him anyway for a legitimate reason . . . . In that case, the improper motive would have done no work, had no effect, left the world unchanged.").

## II. Access to the Courts

Prisoners are entitled to meaningful access to the courts. *See Huber v. Anderson*, 909 F.3d 201, 210 (7th Cir. 2018) (citing *Bounds v. Smith*, 430 U.S. 817, 824 (1977)). To prevail on an access-to-the-courts claim, Jones must show that Defendants' conduct "prejudice[d] a potentially meritorious challenge to the prisoner's conviction, sentence, or conditions of confinement," and that it caused "actual injury." *See Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006); *see also Lewis v. Casey*, 518 U.S. 343, 351 (1996). Actions by a prison official that are "merely 'negligent' [are] insufficient to support . . . a denial of access to the courts . . . claim under § 1983." *Hunter v. Welborn*, 52 F. App'x 277, 280 (7th Cir. 2002) (citations omitted); *see Funches v. Ebbert*, 638 F. Supp. 2d 1014, 1019 (S.D. Ill. 2009) (internal citations omitted) (noting that the right of access to the courts does not permit recovery for careless or negligent acts). Indeed, "[d]enial of access to the courts must be intentional; 'simple negligence will not support a claim that an official has denied an individual of access to the courts.'" *Ganus v. Carter*, No. 3:18-cv-928, 2019 WL 2602865, at *2 (N.D. Ind. June 24, 2019).

Jones asserts that Wickman attempted to hinder his access to the courts when he ordered destruction of the entire stack of documents confiscated from Jackson's cell. Jones and Jackson

both swear that every single document that belonged to Jones in that stack of documents contained Jones' name and case caption, so his documents could have been separated.[2]

Jones never filed any of his three civil lawsuits; therefore, no reasonable jury could conclude that he had an actual injury. It's possible that failure to produce "exhibits, declarations, memorandums, inmate complaints, Health Services Unit (HSU) request forms, Psychological Services Unit (PSU) request forms, etc." could cause Jones to lose a meritorious claim, but that is pure speculation in the absence of an actual lawsuit. The court notes that Jones did not need the documents described above to file a lawsuit. As he demonstrated in this case, *see* Dkt. No. 1, a short, plain statement of facts would do. Wickman's decision to order destruction of the entire stack of documents may have been hasty, or negligent, but nothing in the record shows that Jones suffered an actual injury as a result. Therefore, the court will grant Defendants' motion for summary judgment and dismiss this case.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 42) is **DENIED** and Defendants' cross-motion for summary judgment (Dkt. No. 49) is **GRANTED**. The Clerk is directed to enter judgment dismissing the case with prejudice.

**SO ORDERED** at Green Bay, Wisconsin this 28th day of February, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court

---

[2] The court notes that Jones filed over 450 documents in his summary judgment briefing materials alone. Only a few of those documents "clearly" have his name and case caption on it. If Jones' "legal materials" contained documents such as the ones filed in this case, the court finds it implausible that every single document in the stack that belonged to Jones "clearly" contained his name and case caption.